IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| WILLIAM JOSHUA REGAN, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION FILE |
| v. | : | |
| | : | NO. |
| | : | |
| TRANS UNION LLC, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

**COMPLAINT FOR DAMAGES**

**INTRODUCTION**

1. This is an action for damages brought by Plaintiff William Joshua Regan ("Plaintiff" or "REGAN"), an individual consumer, against TRANS UNION LLC ("TRANS UNION") pursuant to the Federal Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq., as amended.* (hereinafter "FCRA").

**SUBJECT MATTER JURISDICTION**

2. Subject matter jurisdiction in this Court is proper pursuant to 15 U.S.C. § 1681p.

3. Venue lies properly in this district pursuant to 28 U.S.C. §1391(b).

## PARTIES AND PERSONAL JURISDICTION

4. Plaintiff is a resident of Georgia and is a consumer as defined by the FCRA, 15 U.S.C. § 1681a(c).

5. Defendant TRANS UNION LLC (hereafter "TRANS UNION") is a foreign Limited Liability Company that regularly conducts substantial business in the State of Georgia, and which has principal places of business in Chicago, Illinois and Crum Lynne, Pennsylvania.

6. TRANS UNION may be served by personal service upon its registered agent in the State of Georgia: The Prentice-Hall Corporation System, Inc., 40 Technology Parkway South, Suite 300, Norcross, GA 30092.

7. TRANS UNION is a consumer reporting agency as defined by the FCRA, 15 U.S.C. § 1681a(f).

## FACTUAL ALLEGATIONS

8. The FCRA requires that credit reporting agencies such as TRANS UNION, in preparing a credit report, must "follow reasonable procedures to assure maximum possible accuracy of the information" in the report. 15 U.S.C. § 1681e(b).

9. The FCRA requires that credit reporting agencies ("CRAs") conduct a reasonable reinvestigation of any information that is disputed by a consumer to determine if the information is accurate. CRAs must notify the source of the information of the dispute within five days. CRAs must provide the source with all relevant information received from the consumer. CRAs must review and consider all relevant information provided by the consumer in conducting the reinvestigation. CRAs must delete or modify information that is found to be inaccurate or incomplete, or that cannot be verified. CRAs must complete the reinvestigation within 30 days, or within 45 days if the dispute is based on a free annual credit report. CRAs must send a consumer written results of the reinvestigation and a credit report that is based on the consumer's file as that file is revised because of the reinvestigation. 15 U.S.C. § 1681i(a).

10. The policies and procedures of TRANS UNION do not insure compliance with 15 U.S.C. § 1681i(a) of the FCRA.

11. A major problem in the credit reporting industry is the mixed file. A mixed file occurs when one consumer's information is placed on the consumer report of another consumer. The CRAs' procedures for matching consumer

information to a consumer report often causes the mixing of one consumer with another.

12. Mixed files create a false description of a consumer's credit history. Further, mixed files result in the disclosure of a consumer's confidential financial and personal information to persons who should not receive it.

13. Mixed File victims often have their confidential personal and financial information wrongly inserted into the credit file of one or more other persons and/or have the personal and financial information of another wrongfully inserted into their credit file without their knowledge and as a result, the mixed file victims often end up being plagued with significant adverse collection activity and lower credit scores that limit their access to credit.

14. Mixed files are not a new phenomenon. The CRAs have known about mixed files for over thirty (35) years. *See Thompson v. San Antonio Retail Merchants Ass'n,* 682 F.2d 509 (5th Cir. 1982).

15. Mixed files occur despite consumers' having unique personal identifying information, such as Social Security numbers. The CRAs' matching logic allows information to be included in a consumer's file even when the Social

Security number reported with the information is different than the Social Security number on the consumer's file.

16. TRANS UNION knows its matching procedures are causing inaccurate credit reports and mixed files.

17. In the 1990's, the Federal Trade Commission ("FTC") filed a lawsuit against Equifax, Trans Union and Experian's predecessor TRW because of their failure to comply with the FCRA, including the mixing of consumers' files.

18. In the 1990's, the Attorneys General of a number of states filed a lawsuit against Equifax, Trans Union and TRANS UNION's predecessor TRW because of their failure to comply with the FCRA including the mixing of consumers' files.

19. In 1992, Trans Union signed a Consent Order with the Attorneys General of 17 states.  Trans Union agreed that it would maintain reasonable procedures to prevent the occurrence or reoccurrence of mixed files.  For example, procedures during the reinvestigation process include, assigning mixed file cases to Senior Investigators who, as appropriate, must pull all files related to the consumer, fully verify disputed information, make any changes, deletions or additions to correct the file and resolve the dispute, and prepare

a summary of the problem to be filed with another department for corrective action.

20. The CRAs continue to repeatedly mix consumers' files despite their agreements with the FTC and State Attorneys General, and hundreds of lawsuits filed against the CRAs by consumers whose files have been mixed.

21. Over the last twenty-five years, TRANS UNION has been sued many hundreds of times by consumers whose files were mixed with a different consumer by TRANS UNION.

22. Despite federal law, Congressional mandates, federal and state government enforcement actions, and thousands of consumer complaints and many hundreds of consumer lawsuits, mixed files with TRANS UNION remain a significant problem for consumers, including Plaintiff.

23. The sale of consumers' most private and sensitive personal and financial information is a multi-billion-dollar industry for the CRAs.

24. TRANS UNION's 2016 annual report showed a steady incline in revenue each quarter with a total reported revenue of approximately $1.7 billion for 2016. https://investors.transunion.com/~/media/Files/T/Transunion-

IR/annual-reports/2016/tru-2016-annual-report-final.pdf (see page 119, last visited December 20, 2017)

## FACTS OF PLAINTIFF'S MIXED CREDIT FILE WITH DEFENDANT TRANS UNION

25. As specified below, since at least May of 2014, TRANS UNION has repeatedly prepared and issued credit reports on Plaintiff that include inaccurate information.

26. In May of 2014, plaintiff became aware that a Santander Consumer USA ("Santander") auto loan account ending in _9770 and that belonged to someone else was placed on his credit file with Trans Union.

27. Plaintiff had no auto loan with Santander or any other company at that time.

28. The Santander auto loan account was not reported on his credit file with any other credit reporting agencies, including but not limited to Experian and Equifax.

29. Plaintiff contacted Santander on or about May 23, 2014 and spoke to an individual identified as Alan M. and after some research it was confirmed by Alan M. that there was no account under Plaintiff's social with Santander

and he was advised that Trans Union likely entered the information incorrectly.

30. On the same day, Plaintiff contacted TRANS UNION and spoke to and individual identified a Daniel Stevens who opened a case and provided Plaintiff with a case file number 322110392 to follow the investigation of the problem with Plaintiff having mixed information in his file.

31. On June 10, 2014, Plaintiff contacted TRANS UNION again to check on the status of his May 23 dispute and conference with Daniel Stevens.

32. Plaintiff spoke with an individual at Trans Union identified as Brian Warren who informed him that the dispute was denied by Santander and they had confirmed the debt was his.

33. Plaintiff reaffirmed this was a mistake and that Alan M. at Santander confirmed it was a mistake to him and that TU was mixing him up with someone else with a similar social security number.

34. Plaintiff was transferred by Mr. Warren to a supervisor who identified as Christopher Antoinette and asked Plaintiff to call back to Santander again.

35. Plaintiff contacted Santander and was advised again by Alan M. who was able to pull up the delinquent account and verified that the name on it did not

match his name and that there was a slight variation in the social security number.

36. Plaintiff again contacted TRANS UNION and spoke to Megan M., who advises that Trans Union was not responsible for the mix up and that the error was the fault of Santander and he would have to contact them to have it corrected and removed from his credit file with Trans Union.

37. Plaintiff then contacted another person at Santander who identified himself only as Paul and who was unhelpful, and tried to convince Plaintiff that the account that clearly belonged to another person was his and that Plaintiff was in fact delinquent.

38. Plaintiff received results of his dispute dated June 10, 2014 which both reaffirmed the Santander account that did not belong to him, but also included the insertion of other accounts including a Wells Fargo Mortgage, two personal loans, a repossessed car, a credit card, and numerous 'hard' inquiries from companies that he had never given permission to check his credit file.

39. Plaintiffs June 10, 2014 credit file with TRANS UNION also contained inaccurate personal information which included South Carolina addresses,

South Carolina area code phone numbers and an employer that belonged to an individual named William J. Menchyk and who resided in South Carolina.

40. Specifically, the South Carolina phone numbers (864)236-0331, (864)373-9059, and (864)498-1206 were included on his credit file, all of which never belonged to Plaintiff.

41. Specifically, the South Carolina addresses of 300 N Highway 25 BYP APT 35, Greenville, SC 29617-7204 and 22 E. Fairfield Road, Greenville, SC 29605-2757 (since 2/1/99) were both included on his credit file, all of which never belonged to Plaintiff.

42. Specifically, there was a reference to an employer and job position that Plaintiff had never had as a "Dye Maker" with "Collins & Ackerman."

43. In addition to the Santander account, TRANS UNION also reported several other accounts that did not belong to Plaintiff on his credit file with them, including but not limited to a Wells Fargo Home Mortgage account ending in -1752 and a CitiFinancial account beginning with -6074.

44. TRANS UNION also disclosed in the report that they sent Plaintiff that he had been in their system since 1986, which would have meant that plaintiff

was only 5 years old when TRANS UNION started a credit file on him as he was born in 1980.

45. Plaintiff is not related, friends with or acquainted in any other way with the individual named William J. Menchyk.

46. After advising TRANS UNION that his information was in fact mixed with William J. Menchyk, rather than fixing it, TRANS UNION continued selling inaccurate negative information about Plaintiff that belonged to Mr. Menchyk to various creditors. This information TRANS UNION sold to creditors, placed Plaintiff in a negative light and falsely portrayed him as being less credit worthy than he actually was.

47. Tran Union was contacted by One Main Financial in or around the summer of 2014 and advised that the tradeline relating to account ending in _5173 was invalid as to Plaintiff and they further requested its deletion from Plaintiff's credit file.

48. After obtaining the One Main Financial letter and their request to remove it from Plaintiff's file since there was a mix up, TRANS UNION allowed the inaccurately attributed 'hard' inquiries from One main to remain on plaintiff's file rather than transferring them to William Menchyk' s credit

11

file, despite knowledge that One Main's hard inquiries were not authorized by Plaintiff nor related to him.

49. Plaintiff also tried several online disputes and first-class mail disputes with Trans Union in or around 2014 and early 2015, all but two of which did not receive a response and the two responses he did receive failed to fix the mixed file information contained in his credit file.

50. In 2015, Plaintiff was renting a home owned by his father, and his father asked if he could obtain a mortgage on the house to relieve them from carrying two mortgages.

51. In April of 2015, Plaintiff approached his bank branch manager, Candace Green at South State Bank about obtaining a loan and showed her his report with the William Menchyk information on it and she said the only way he could obtain a loan was to dispute the William Menchyk information and get it removed.

52. In May of 2015, plaintiff sent another dispute for which he did not receive a response.

53. In late 2015, Plaintiff and his wife decided they wanted to move closer to his wife's work place. They applied for a mortgage with CBC National

        Mortgage and were advised by the mortgage officer, Jill Wiley, that the negative mixed information belonging to Mr. Menchyk on Plaintiff's TU report would likely prohibit them from jointly obtaining a loan, but that they could still obtain a loan at a decent rated based solely on his wife's information and she recommended that they apply solely in her name.

54. Plaintiff and his wife purchased the house on New Years Eve, 2015.

55. Plaintiff was extremely embarrassed at the closing that he could not be a named party to the loan for his house and thereafter felt ashamed of this fact and went out of his way to hide loan statements from other family members and friends when they came over to avoid having them see it without his name on it to avoid questions or assumptions about his marital or financial condition.

56. In or about April of 2016, plaintiff became aware that TRANS UNION was inaccurately reporting a Greenville County South Carolina State Tax Lien against Plaintiff for more than twenty-five hundred dollars.

57. Plaintiff spent a significant amount of time with the Greenville County Court System and South Carolina Department of Revenue trying to fix this erroneously reported tax lien.

58. Plaintiff was ultimately able to get Ashley Williams, the call center supervisor for the South Carolina Department of Revenue to mail a personalized letter directly to TRANS UNION on April 22, 2016 which explained that the Tax lien number was not recorded against Will Regan of Canton, Georgia but was rather against William Menchyk.

59. Plaintiff did not receive confirmation that the South Carolina Tax Lien was removed after the South Carolina Department of Revenue sent the explanatory letter to them.

60. Plaintiff pulled a copy of his trans Union Credit report on July 23, 2016 and was distressed to learn the tax lien had not been removed.

61. Plaintiff sent a communication to Trans Union with a copy of Mrs. Williams letter of explanation disputing the tax lien and requesting the deletion of this false information from his credit file.

62. Plaintiff did not receive a response to this dispute.

63. In early 2017, plaintiff was trying to obtain financing to pair with the proceeds from the sale of his business for several commercial properties when he learned that the South Carolina tax lien was still not removed from his Trans Union credit file despite the letter from the State of South Carolina

Department of Revenue's call center supervisor advising TRANS UNION it was not his and his direct dispute from July of 2016.

64. Plaintiff received a copy of his February 12, 2017 TRANS UNION credit report which in addition to the South Carolina Tax Lien, Plaintiff noticed that all the other information related to William Menchyk that he had previously disputed, including his name, South Carolina phone numbers, South Carolina Addresses, and various adverse tradelines were still being reported.

65. Plaintiff initiated a series of at least 6 certified disputes letters between February and July of 2017 which ultimately resulted in all the adverse information finally being removed in piecemeal fashion.

66. Plaintiff was delayed and chilled in his ability to obtain credit to make additional commercial land purchases, refinance his home at a lower rate with his wife, obtain credit cards, and otherwise consider business opportunities that he would have otherwise qualified for.

67. TRANS UNION furnished Plaintiff's credit reports for use in transactions that did not involve Plaintiff, in violation of 15 U.S.C. §1681b.

68. Upon information and belief, TRANS UNION furnished Plaintiff's information in the credit reports of William Menchyk for use in transactions that did not involve Plaintiff, in violation of 15 U.S.C. §1681b.

69. Plaintiff has been forced to spend significant amounts of personal time trying to correct the inaccurate information reported by TRANS UNION and deal with the consequences of TRANS UNION's inaccurate reporting.

## FIRST CLAIM FOR RELIEF

(against TRANS UNION)

(Negligent Noncompliance with FCRA)

70. Plaintiff realleges and incorporates paragraphs 1 through 69.

71. TRANS UNION negligently failed to comply with the requirements of the FCRA, including but not limited to, 15 U.S.C. §1681b, e and i.

72. Because of TRANS UNION's failure to comply with the requirements of the FCRA, plaintiff has suffered and continues to suffer, actual damages, including economic loss, denial of credit, lost opportunity to receive credit, damage to reputation, invasion of privacy, emotional distress and

interference with Plaintiff's normal and usual activities for which Plaintiff seeks damages in an amount to be determined by the jury.

73. Plaintiff requests attorney fees pursuant to 15 U.S.C. § 1681o(a).

## SECOND CLAIM FOR RELIEF

(against TRANS UNION)

(Willful Noncompliance with FCRA)

74. Plaintiff realleges and incorporates paragraphs 1 through 69.

75. TRANS UNION willfully failed to comply with the requirements of the FCRA, including but not limited to, 15 U.S.C. §1681b, e and i.

76. Because of TRANS UNION's failure to comply with the requirements of the FCRA, plaintiff has suffered and continues to suffer, actual damages, including economic loss, denial of credit, lost opportunity to receive credit, damage to reputation, invasion of privacy, emotional distress and interference with Plaintiff's normal and usual activities for which Plaintiff seeks damages in an amount to be determined by the jury.

77. Plaintiff also seeks punitive damages in an amount to be determined by the jury.

78. Plaintiff requests attorney fees pursuant to 15 U.S.C. § 1681n(a).

## JURY TRIAL DEMAND

79. Plaintiff demands a jury trial on all claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against defendant as follows:

On the First Claim for Relief:

1. Actual damages to be determined by the jury; and
2. Attorney fees.

On the Second Claim for Relief:

1. Actual damages to be determined by the jury;
2. Punitive damages to be determined by the jury; and
3. Attorney fees.

On All Claims for Relief:

1. Costs and expenses incurred in the action.

DATED this 22nd day of December 2017.

Respectfully submitted,

**SKAAR & FEAGLE, LLP**

18

by: s/ James M. Feagle
James M. Feagle
Georgia Bar No. 256916
jfeagle@skaarandfeagle.com
Cliff R. Dorsen
Georgia Bar No. 149254
cdorsen@skaarandfeagle.com
2374 Main Street
Suite B
Tucker, GA 30084
404 / 373-1970
404 / 601-1855 fax

Kris Skaar
Georgia Bar No. 649610
kskaar@skaarandfeagle.com
Justin T. Holcombe
Georgia Bar No. 552100
jholcombe@skaarandfeagle.com
133 Mirramont Lake Drive
Woodstock, GA  30189
770 / 427-5600
404 / 601-1855 fax

Robert S. Sola *(pro hac vice will be applied for after Complaint is docketed)*
**ROBERT S. SOLA, P.C.**
rssola@msn.com
1500 SW First Avenue, Suite 800
Portland, OR 97201
503 / 295-6880
503 / 243-4546 fax

19